(141 App. Div. 188.)

### In re KINDBERG'S WILL.

(Supreme Court, Appellate Division, First Department.   December 2, 1910.)

1. WILLS (§ 302\*)—SUBSCRIBING WITNESSES—WEIGHT OF EVIDENCE.
   The fact that a will was executed under the supervision of a lawyer would tend to confirm rather than discredit the testimony of a subscribing witness showing that the formalities required by statute had been complied with.
   [Ed. Note.—For other cases, see Wills, Dec. Dig. § 302.\*]

2. WILLS (§ 303\*)—EXECUTION—FORMAL REQUISITES—EVIDENCE.
   Evidence of a subscribing witness *held* sufficient to show a compliance with the statutory requirements relative to the execution of a valid 'will.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 711–723; Dec. Dig. § 303.\*]

3. WILLS (§ 166\*)—UNDUE INFLUENCE—BEQUEST TO TESTATOR'S ATTORNEY.
   The fact that the principal beneficiary was testator's attorney who prepared the will and superintended its execution, was not sufficient of itself to warrant an inference of undue influence.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.\*]

4. WILLS (§ 156\*)—UNDUE INFLUENCE—CONDITION OF TESTATOR.
   Whether a will is the result of undue influence of the principal beneficiary, depends principally on the mental and physical condition of the testator.
   [Ed. Note.—For other cases, see Wills, 'Cent. Dig. § 382; Dec. Dig. § 156.\*]

5. WILLS (§ 324\*)—UNDUE INFLUENCE—QUESTION FOR JURY.
   In an action to probate a will, evidence *held* insufficient to establish as a matter of law that the will was the result of undue influence on the part of the principal beneficiary, but to require submission of such question to the jury.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 767–770; Dec. Dig. § 324.\*]

Appeal from Surrogate's Court, New York County.

Application by the Presbyterian Hospital of the City of New York for the probate of the will of Edward O. Kindberg, deceased, dated October 29, 1906, and application of August Reymert for probate of a later will said to be executed March 25, 1907. From a surrogate's decree denying probate of the March will and admitting to probate the October will, Reymert and others appeal. Reversed, and new trial granted.

Argued before INGRAHAM, P. J., and LAUGHLIN, SCOTT, CLARKE, and MILLER, JJ.

James M. Hunt, for appellant Reymert.
Thomas Gregory, for appellants Infant Legatees.
Robert Thorne, for respondent.

MILLER, J. The testator left an estate estimated at approximately $80,000. His sole next of kin was a brother, to whom he did not wish to leave any of his property, as the two were not on friendly terms. By the October will, he gave substantially his entire estate

to the Presbyterian Hospital of the City of New York, the respondent. By the March will, if it was his will, he gave $10,000 to the son of his brother; $10,000 to the son of his deceased wife's sister; $5,000 to his attending physician; $5,000 to a Mrs. L. Gehlert; $2,500 to the wife of Edward J. Stapleton, one of the subscribing witnesses; $5,000 to each of the three daughters of August Reymert, the appellant; his furniture to Katherine Magee; and the residue of his estate to the said August Reymert, whom he appointed his executor. Shortly before the making of the October will, the testator's wife committed suicide. No reason is suggested why he desired to leave his entire estate to the Presbyterian Hospital unless it can be inferred from the state of his mind, immediately succeeding the tragic death of his wife, and the fact that, about four years before her death, she was treated in that hospital for about two weeks. There is some testimony, given by apparently disinterested witnesses, to the effect that the testator considered the October will as a temporary arrangement to bridge over the time until he should ultimately determine what final disposition to make of his property, his declared purpose being to prevent his brother inheriting his estate; on the other hand, there is testimony tending to indicate that he regarded that will as the final disposition of his property. There is evidence to show that the said Mrs. Gehlert was a friend of the testator's deceased wife; that Mr. and Mrs. Stapleton were acquaintances of more than 20 years standing; that the testator greatly admired his physician; and that the said Reymert was his most intimate friend. Both wills were drawn by one Rozanski, said Reymert's law clerk, the October will pursuant to instructions communicated directly by the testator to Rozanski; the March will pursuant to a memorandum in the handwriting of Reymert, delivered by him to the said Rozanski. Both wills were executed in duplicate.

There is no question, respecting the execution of the October will or the testamentary capacity of the testator at the time. But the surrogate found that, at the time of the execution of the paper, bearing date March 25th, the decedent was sick and had been confined to his bed for about a month; that he was not fully normal, and, although it was possible to arouse him for a few moments at a time, that his disorder had caused a degradation of his powers of memory and attention, and that he quickly relapsed into a condition of sleep or semicoma; that the paper was not read or explained to the decedent, and that there was no evidence to show that he had actually read the paper or knew what it meant, or that he intelligently comprehended its meaning, or that it expressed his free and untrammeled wish and intention; that he did not declare the paper to be his will, and that the witnesses who subscribed their names to the paper were not requested by him to do so, and that the paper was the result of undue influence, exercised over the decedent by the said August Reymert.

The first question to be considered, then, on this appeal, is whether there was sufficient proof of the due execution of the March will. That depends upon the testimony of the subscribing witnesses, Stapleton and Rozanski. It appears that Rozanski, Stapleton, and Reymert

called upon the decedent, evidently for the purpose of having the will executed. Stapleton testified that they found the decedent propped up in bed, and after some conversation, in which all present participated, Reymert said: "Ed, I have brought that will up for you to sign, and I brought Mr. Stapleton and Clement here as witnesses. Would you like to execute it now?" to which the decedent replied, "Yes;" that the papers were then handed to the decedent, who "looked at it, read it all over carefully, turned the leaves over, read it all over carefully. He took considerable time in reading it, and after he got through reading it, he said, 'That is all right;'" that Reymert then procured a book and a pen from a desk where the decedent told him to find one, and the decedent then signed both papers, propped up in bed and using the book to write upon; that "he signed it very carefully, * * * took his time about it, and, after he got through, he says, 'It is not a very good signature, but I guess it will go all right.' * * * I said, 'Ed, do you wish me to sign this as a witness?' I did not hear him answer, but his head was bowed, and I took that to be at his request, and I went over to the desk, and signed the will, the copy, and then I got up and the other witness sat down. I saw him in the act of signing it." The witness further testified:

"Q. In your opinion was Mr. Kindberg of sound mind and memory when you saw him sign that will? A. I should say he was. He was just as sound as I ever saw him in my life. He was a man of positive force. A very decided man. He was rational at the time he signed the will; yes, everything about him. His mind was as clear as a bell at that time."

The witness Rozanski testified, with respect to the conversation introducing the subject of the will, that Reymert said, "Ed, I have drawn that will according to your instructions of yesterday, and I brought here Clement and Mr. Stapleton to sign as witnesses as you wanted;" that the decedent said, after carefully reading the will, "That is all right, that is just what I want;" that, after signing the paper, the decedent turned to them and said, "Here, you sign as witnesses;" and that Reymert took up one of the papers and read the attestation clause.

The learned surrogate did not credit the testimony of Rozanski; and held that the testimony of Stapleton was not sufficient to show publication or a request of the witnesses to sign as witnesses. We are unable to discover anything in this record to discredit Rozanski. The fact that the will was executed under the supervision of a lawyer would tend to confirm, rather than discredit, his testimony, showing that the formalities required by the statute were complied with. Moreover, the testimony of Stapleton alone was sufficient on that head. There can be no doubt from his testimony that, as between the witnesses and the decedent, the latter wished it to be understood that the paper, signed by him, was his will, and that he desired them to sign as witnesses; and that is all the statute requires. Matter of Balmforth, 133 App. Div. 521, 117 N. Y. Supp. 1065, and cases cited. The learned surrogate interpreted the testimony of Stapleton to the effect that the testator's "head was bowed" to mean that his head was hanging down either in sleep or stupor; and the learned coun-

sel for the respondent states that the testator's head was bowed and *remained so.* We find nothing in the record to justify either the statement of counsel or the inference of the learned surrogate, and it is apparent from the testimony of the witness that he did not intend any such inference to be drawn. He gave a straightforward account of a natural transaction in which the testator took an active and intelligent part throughout, being alert and attentive to all that was said and done. We have, then, a case in which the subscribing witnesses testified to a compliance with all the formalities required by the statute, strengthened by the fair inference to be drawn from the fact that the paper was executed under the supervision of a lawyer. The findings of the surrogate on that head are, therefore, plainly contrary to the evidence.

The serious question in the case is whether the March will was the result of undue influence, exercised by the appellant. The findings of the surrogate with respect to the publication of the will and the request to the witnesses to sign it, tend to weaken the force of his finding with respect to undue influence. Reymert was the testator's intimate friend and attorney. The will was prepared pursuant to his directions and was executed under his supervision. He and his daughters were given more than half of the testator's estate. Upon the face of the two wills, there was a complete change of testamentary intention within five months. While only 55 years of age, the testator was confined to his bed by sickness and died five days later. The fact that Reymert, the principal beneficiary, was the testator's attorney and prepared the will and superintended its execution, standing alone, would not be sufficient to warrant an inference of undue influence. Post v. Mason, 91 N. Y. 539, 43 Am. Rep. 689; Matter of Suydam, 84 Hun, 514, 32 N. Y. Supp. 449, affirmed 152 N. Y. 639, 46 N. E. 1152, on the opinion below; Haughian v. Conlan, 86 App. Div. 290, 83 N. Y. Supp. 830. But we think that, in connection with the other circumstances referred to, it did impose upon the proponent the burden of proving more than would ordinarily suffice. Matter of Rintelen, 77 App. Div. 142, 78 N. Y. Supp. 1092. However, the inference to be drawn depends principally upon the mental and physical condition of the testator.

The testator was described by different witnesses as a man "of positive force; a very decided man." "A strong business man"; "a good business man; very methodical and very decided." The respondent's witnesses testified that he retained those qualities up to the 16th of March. It does not appear distinctly what was the cause of death. The attending physician being a legatee, was precluded from testifying on behalf of the proponents. The decedent became so ill the night before his death, on the morning of March 30th, that a trained nurse was called in to attend him, but the latter was not called as a witness. If the testimony of the subscribing witnesses is to be believed, the decedent was in the full possession of his mental faculties on the 25th of March and was then feeling so well that he expected to be up and about in a few days. Their call lasted about half an hour. Their narrative of the conversation and occurrences is so natural as to furnish internal evidence of its

truth. They are corroborated with respect to the testator's condition by three apparently disinterested witnesses, musicians at a nearby restaurant where the decedent was in the habit of dining, two of whom called on the decedent on the 25th and one on the 26th, the latter being called as a witness by the respondent.

The respondent called Henry Clark, Susan and Katherine Magee, William M. Soule and Sarah T. Soule, whose testimony tends to show that the decedent was in a semicomatose condition for some time prior to the 25th of March up to the day of his death. Clark was a house servant, employed at $3 per week by the Misses Magee of whom the decedent rented a room. He claims that he acted as a nurse for the decedent for about two weeks prior to the latter's death, and it is evident that he did wait upon him during that period. The witnesses Soule were the father and mother of one of the legatees who was given $10,000. Soule admitted that he had been assured by the attorney for the respondent that his son should receive that amount in any event, and there is no denial that such a promise had been made him. Clark is now an orderly in one of the city hospitals, and the witness Katherine Magee, who was bequeathed the furniture, released her legacy for the purpose of being a witness, as she says, without any arrangement with the respondent and without being advised to do so. The testimony of each one of these witnesses shows conscious effort to favor the respondent. Upon important details, they are contradicted by apparently disinterested witnesses, and we think that they are contradicted by an unimpeachable witness; i. e., the signatures of the testator to the papers of March 25th, which were produced for our inspection upon the argument in this case.

As the foregoing analysis of the testimony indicates, we are of the opinion that this case should be submitted to a jury. Matter of Tompkins, 69 App. Div. 474, 74 N. Y. Supp. 1002; Matter of Warnock, 103 App. Div. 61, 92 N. Y. Supp. 643; Matter of Eckler, 126 App. Div. 199, 110 N. Y. Supp. 650; Matter of Richardson, 137 App. Div. 105, 122 N. Y. Supp. 83. Further discussion is, therefore, unnecessary at this time. The decree of the Surrogate's Court should be reversed and a new trial by a jury should be had on the following questions: (1) Did Edward O. Kindberg possess testamentary capacity at the time of the execution of the alleged will of March 25th, 1909? (2) Was said alleged will duly executed by him? (3) Was the execution of said alleged will procured by fraud or undue influence practiced upon him?—with costs to abide the event of the new trial, payable out of the estate. All concur.